# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PATRICIA HURLIE-SMITH,
    *Plaintiff*,

    v.                                                    No. 3:16-cv-1870 (VAB)

QUINNIPIAC UNIVERSITY,
    *Defendant*.

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

On November 14, 2016, Patricia Hurlie-Smith ("Plaintiff") filed this lawsuit against

Quinnipiac University ("Defendant" or "Quinnipiac"), alleging discrimination on the bases of

sex and age, in violation of Title VII, 42 U.S.C. § 2000e, *et seq*., and the Connecticut Fair

Employment Practices Act ("CFEPA"), Conn. Gen. Stat. 46a-60. Compl., ECF No. 1.

Quinnipiac has moved for summary judgment. Mot. for Summ. J., ECF No. 30.

For the following reasons, Quinnipiac's motion for summary judgment is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Allegations

In March 2004, Quinnipiac hired Ms. Hurlie-Smith as a part-time security guard and

assigned her to a bus detail that transported students from Quinnipiac's campus in Hamden to

New Haven from 8:00 p.m. until 4:00 a.m. on Thursday, Friday, and Saturday evenings. Def.'s

Stmt. of Material Facts ¶ 1 ("Def.'s SMF"), ECF No. 30-5.

Ms. Hurlie-Smith originally reported to Sergeant Bill Canning. Hurlie-Smith Dep. at

31:14–16, Mot. Summ. J. Ex. B, ECF No. 30-2.

In 2007 or 2008, Quinnipiac eliminated part-time positions, and, as a result, Ms. Hurlie-Smith had to attain full-time status to continue working at the university. Def.'s SMF ¶ 2. Ms. Hurlie-Smith added two overnight shifts per week working at a security booth from midnight to 8:00 a.m. *Id.* Her hourly pay rate was the same for both positions. *Id.* Security personnel responsible for the bus program were known as the "Tactical Unit," or the "TAC Team," and they were responsible for running shuttles, managing the taxi stand area, and facilitating the flow of traffic on days when students were moving onto and off of the campus. *Id.* ¶ 3.

On one of those days, when students were moving onto campus, Sergeant Canning "sent [Ms. Hurlie-Smith] over to another side of campus with nothing to do, with no explanation as to why this happened." Pl.'s Stmt. of Material Facts ("Pl. SMF") at 10, Obj. to Mot. for Summ. J. Ex. B, ECF No. 31-2.

In June 2014, Quinnipiac removed Ms. Hurlie-Smith from the TAC Team. *Id.* at 10. She asked Chief Dave Barger why, and he responded that "it was 'time to pass the torch.'" *Id.* Ms. Hurlie-Smith also claims that, when she asked to stay working on the buses in the fall of 2014, he told her that "she was not getting any younger." *Id.*

In 2014, Ms. Hurlie-Smith filed a complaint with the EEOC. EEOC Release, Mot. for Summ. J. Ex. B, ECF No. 30-2. The EEOC found that it was unable to conclude that Ms. Hurlie-Smith's allegations violated Title VII, and instructed that she "may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court" but the "lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost." *Id.*

On January 29, 2015, Nicole Lambusta, who was at the time the Human Resources Business Partner, called Ms. Hurlie-Smith to discuss her assignment with the TAC Team. *Id.* ¶ 4.

On the call and in a follow-up e-mail, Ms. Lambusta stated that Ms. Hurlie-Smith would be assigned to the express buses on the TAC Team, she would perform the functions of the "Officer in Charge" on Saturday nights and other nights when no Sergeant was present, she would resume her former responsibilities of directing all south lot major staging, that Sergeant Canning would not be working with the TAC Team, that Quinnipiac would clarify and distribute information about the TAC Team roles, and offering: "Chief Barger is happy to send the following email to the Public Safety Department before you return to the TAC Team: 'Pat Hurlie-Smith has decided to return to the TAC Team and will begin again February 15, 2015.'" *Id.*

Two days before receiving Ms. Lambusta's email, Ms. Hurlie-Smith went on medical leave for an injured knee. *Id.* ¶ 5.

In April 2015, while on medical leave, Ms. Hurlie-Smith called Chief Edgar Rodriguez. *Id.* ¶ 6. He told Ms. Hurlie-Smith that he had assigned Sergeant Robert Riordan to run the TAC Team, and that the department would no longer have an "Officer in Charge." *Id.* He stated that upon her return, she would be assigned to the South Lot, and he asked her to send him an e-mail memorializing her request to be assigned to the TAC Team, which she did. *Id.*

On April 25, 2015, Ms. Hurlie-Smith returned to work. *Id.* ¶ 7. She replied to Ms. Lambusta's January 30, 2015 e-mail, stating that she had spoken with Chief Rodriguez about returning to the TAC Team and submitted her bid to return there, and requested confirmation that the terms of the January 30 e-mail would apply to the 2015-2016 academic year. *Id.* Ms. Lambusta replied that Chief Rodriguez could work out the transition to the TAC Team, if he had not already done so. *Id.* ¶ 8.

Upon her return, Ms. Hurlie-Smith discovered that the TAC Team no longer ran buses to New Haven, starting before final exams would begin in late April. *Id.* ¶ 9. Instead, she worked

with the TAC Team under Sergeant Riordan's leadership for the first time in May. *Id.* ¶ 10. For the rest of the summer, the TAC Team was inactive, and Ms. Hurlie-Smith worked five shifts per week at the security gate and did not interact with Sergeant Riordan. *Id.* In August 2015, when the TAC Team resumed its work, Ms. Hurlie resumed working three nights per week on the TAC Team and two overnight shifts as a security guard. *Id.* ¶ 11.

On September 8, 2015, Ms. Hurlie-Smith attended a meeting with Chief Rodriguez, Assistant Chief James Nealy, AVP of Human Resources Anna Spragg, and Ellsworth Evarts. *Id.* ¶ 12. Mr. Evarts allegedly objected to Sergeant Riordan's treatment of Ms. Hurlie-Smith, and Ms. Spragg instructed Ms. Hurlie Smith to submit her complaints against Sergeant Riordan by email. *Id.* Ms. Hurlie-Smith agreed to do so. *Id.*

On September 11, 2015, Sergeant Riordan directed Ms. Hurlie-Smith to explain in writing why she had been late on a particular day. *Id.* ¶ 13. Ms. Hurlie-Smith complied and was not disciplined. *Id.*

On September 17, 2015, Ms. Hurlie-Smith sent Chief Rodriguez and Assistant Chief Nealy an e-mail describing her experience during a moving out day for students in May 2015. *Id.* ¶ 14. On that day, she sought Sergeant Jim Moniello's assistance in asking Sergeant Riordan to move Officer Rhonda Rinaldi to another location to help with "staging" vehicles, which meant lining up vehicles in a parking lot until room was available near residence halls. *Id.* ¶ 15. Sergeant Riordan asked Ms. Hurlie-Smith why Officer Rinaldi needed to be moved; when she answered, he told her that there was no need to stage the vehicles and walked away. *Id.* Later in the day, Sergeant Riordan asked why cars were not being permitted to go to the residence halls, and Ms. Hurlie-Smith responded that they were being restaged in South Lot. *Id.* Sergeant Riordan responded that it was his call. *Id.* Ms. Hurlie-Smith stated that Sergeant Riordan had not

been in the field in the first place, that she was implementing the same procedure that she had used in the past, and that he was "not taking the professional initiative to understand the process." *Id.*; *see also* E-mail, Hurlie-Smith Dep. at 194–97, Exh. U.

On September 18, 2015, Ms. Hurlie-Smith sent a second e-mail to Chief Rodriguez and Assistant Chief Nealy, describing five additional interactions with Sergeant Riordan, two on Move-In day, and three on September 5, in downtown New Haven, while Ms. Hurlie-Smith was managing the shuttle buses. *Id.* ¶ 16.

Ms. Hurlie-Smith allegedly began a Move-In day by staging vehicles at the Hilltop parking lot, until Sergeant Riordan instructed her to switch with Officer Sandra Colon, who was assigned to the South Lot, because he needed Officer Colon in the Hilltop Lot. *Id.* Ms. Hurlie-Smith did not understand the basis for this decision. *Id.* Ms. Hurlie-Smith also stated that Sergeant Riordan scolded her in front of two other individuals for how she was staging cars and instructed her to use a different approach from the one she had used in the past; she thought the new approach was not an effective strategy. *Id.*

Ms. Hurlie-Smith also stated that, on September 5, 2015, in downtown New Haven, she walked away from the bus parking area because she believed a group of young people on bikes posed a threat to Quinnipiac students returning to the buses. *Id.* She stated that Sergeant Riordan had been too busy "BS-ing," had not asked why she left the bus boarding area, and that he later asked her to come help with the bus boarding and mentioned that he did not know why she had left the area. *Id.* Ms. Hurlie-Smith returned to help the students board the buses, and at one point, she stepped into the street to see whether buses were approaching. *Id.* She stated that Sergeant Riordan then yelled "get out of the street, Pat!" *Id.* Later that night, Sergeant Riordan and a New Haven Police Officer were on one of the buses attending to a student who appeared to be in

distress. *Id.* Ms. Hurlie-Smith stood on the step of the bus to prevent students from attempting to board. *Id.* Sergeant Riordan twice told her "We got it, Pat," but she remained standing on the step. *Id.* He then ordered her to get off the step. *Id.*

On October 16, 2015, Ms. Hurlie-Smith sent an e-mail to Sergeant Riordan, copying Chief Rodriguez, Assistant Chief Nealy, and Mr. Evarts, stating that on a Saturday night three weeks earlier, Sergeant Riordan had not been on duty and the following week, he asked other members of the team "how it went with Pat." *Id.* ¶ 17. Ms. Hurlie-Smith requested a meeting with him. *Id.*

Another time, Sergeant Riordan asked to see Ms. Hurlie-Smith in his office, and when she arrived, he was sitting on his desk. *Id.* ¶ 18. She was wearing a windbreaker zipped over her uniform, and he asked her to unzip the jacket so that he could see whether she was wearing her duty belt. *Id.* She sent an e-mail to Chief Rodriguez and Assistant Chief Nealy to recount the incident. She believed she had been singled her out because two other officers were either not wearing a belt or a belt was not visible. *Id.*

On October 29, 2015, Sergeant Riordan presented each member of the TAC Team with a commendation. *Id.* ¶ 19. He praised their handling of an unruly group of students trying to board the shuttle one night in New Haven. *Id.* Ms. Hurlie-Smith refused to sign the commendation because she disagreed with how the students' behavior was described in the report. *Id.* She did not file a complaint about the report, and she was not disciplined for refusing to sign it. *Id.*

Quinnipiac's Human Resources Department conducted an investigation of Ms. Hurlie-Smith's complaints against Sergeant Riordan. *Id.* ¶ 20. Stephanie Mathews, an Employee & Labor Relations Associate, met with three sergeants and nine public safety officers, including Ms. Hurlie-Smith. *Id.* She found that Ms. Hurlie-Smith's claims of extreme behavior on Sergeant

Riordan's part were unsubstantiated. *Id.* ¶ 21. She also found that Ms. Hurlie-Smith, and not

Sergeant Riordan, was the primary source of tension or dysfunction on the TAC Team, including

because Ms. Hurlie-Smith was confrontational with Sergeant Riordan, walked away from him

when he attempted to issue work-related directives, deviated from his orders, resisted his

supervision, and appeared resentful of his supervision of her. *Id.* ¶ 22.

Ms. Mathews and Chief Rodriguez reviewed Ms. Mathews's findings and agreed that

Ms. Hurlie-Smith should be removed from the TAC Team to improve operations. *Id.* ¶ 23. They

assigned Ms. Hurlie-Smith to work full-time on an overnight shift at the security gate. *Id.* ¶¶ 24–

26.

All officers in the Department of Public Safety received an across-the-board 2% salary

increase on July 1, 2016, and a second across-the-board 2% increase the following year, on July

1, 2017. *Id.* ¶¶ 27–28.

**B.    Procedural History**

On November 14, 2016, Ms. Hurlie-Smith sued Quinnipiac, claiming discrimination

because of her sex and her age. Compl. Ms. Hurlie-Smith asserted four counts: (1) a hostile work

environment claim under Title VII of the Civil Rights Act of 1964; (2) a claim for discrimination

on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964; (3) a claim for

discrimination on the basis of her sex in violation of Connecticut General Statutes Section 46a-

60; and (4) a claim for discrimination on the basis of her age in violation of Connecticut General

Statutes Section 46a-60. *Id.*

On January 5, 2018, Quinnipiac filed a motion for summary judgment, claiming that Ms.

Hurlie-Smith failed to "adduce[] sufficient evidence in discovery to engender a genuine issue of

material fact." Mot. Summ. J. at 1. Ms. Hurlie-Smith opposed the motion, ECF No. 31, and

Quinnipiac filed a reply to her opposition, ECF No. 32.

 On August 30, 2018, the Court held a hearing on the motion. ECF No. 34.

## II. STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue

as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may

defeat the motion by producing sufficient specific facts to establish that there is a genuine issue

of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact." *Id.* at 247–48.

A court must view any inferences drawn from the facts in the light most favorable to the

party opposing the summary judgment motion. *Dufort v. City of New York*, 874 F.3d 338, 343

(2d Cir. 2017). A court, however, will not draw an inference of a genuine dispute of material fact

from conclusory allegations or denials, *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir.

2011), and will grant summary judgment only "if, under the governing law, there can be but one

reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.

## III. DISCUSSION

### A. Hostile Work Environment

To establish a hostile work environment claim under Title VII or Connecticut's Fair

Employment Practices Act ("CFEPA"), a plaintiff must show "that the 'workplace is permeated

with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Patino v. Birken Mfg. Co.*, 304 Conn. 679, 691 (2012) (noting, in CFEPA context, that the Connecticut Supreme Court "declared in *Brittell v. Department of Correction*, [247 Conn. 148, 166–67 (2012)], that to support a hostile work environment claim, the workplace must be permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to *alter the conditions of the victim's employment* and create an abusive working environment") (internal quotation marks omitted). The plaintiff must show that the workplace is both objectively "severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo*, 770 F.3d at 114. To be sufficiently severe or pervasive, the "incidents complained of 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted)).

In determining whether an environment is severe or pervasive, courts look to the totality of the circumstances. *Id.*; *see also Lyon v. Jones*, 260 F. Supp. 2d 507, 512 (D. Conn. 2003) ("In determining whether a workplace is hostile or abusive, the finder of fact must look to the totality of the circumstances of the workplace and the alleged harassment, circumstances which may include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'").

Quinnipiac argues that Ms. Hurlie-Smith has failed to establish a hostile work environment because she "identifies a single incident of alleged 'harassment' that she subjectively, albeit irrationally, perceived as 'sexual' nature," *i.e.*, when Sergeant Riordan asked her to unzip her windbreaker she was wearing over her uniform. Mot. Summ. J. at 16, ECF No. 30-1. According to Quinnipiac, this incident "hardly qualifies as severe or pervasive," and Ms. Hurlie-Smith therefore has not established that the claimed harassment was based on her gender. *Id.* at 16–17.

Quinnipiac also argues that Ms. Hurlie-Smith has "adduced no evidence giving rise to an inference that Sergeant Riordan spoke to her in an abrasive, but entirely non-sexual, way because of her sex, nor in any event can she prove such conduct was objectively severe enough to alter the terms of her employment." *Id.* at 17. Quinnipiac asserts that even Ms. Hurlie-Smith "attributes Sergeant Riordan's treatment of her not to gender but to jealousy," because he "resented the fact that she was 'accomplished' and 'knew the program inside and out' on account of her prior leadership role on the TAC Team." *Id.*

In any event, Quinnipiac argues that "whether sex-based or not Sergeant Riordan's alleged 'bullying' was by no means objectively severe or pervasive enough to alter the terms and conditions of plaintiff's employment." *Id.* at 18 (noting that "from May 2015 through October 2015, Sergeant Riordan told her a decision on work assignments was 'his call' after she disregarded his instruction, asked her to swap posts with another officer on a particular shift, scolded her in front of other officers, questioned why she was standing in a particular place, yelled at her to 'get out of the street,' told her to get out of the way, asked her to send him an email explaining why she was late on a particular day, and asked her coworkers 'how it went with Pat' after a particular shift"). Quinnipiac argues that Ms. Hurlie-Smith's claims are "hardly

sufficient to establish that [her] workplace was 'permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Id.* at 18 (quoting *Heyward*, 178 Conn. App. at 764).

Ms. Hurlie-Smith responds that she "has been subjected to an objectively and subjectively hostile work environment" that "unreasonably interfered with [her] work performance and . . . undoubtedly had a profound negative effect on [her] psychological well-being." Opp. to Mot. Summ. J. at 14, ECF No. 31-1. She argues that Sergeant Canning "isolated [her] to a remote parking lot on a day when her skills and experience would have been valuable," that he "did not speak to [her] and alienated her, which [she] attributed to her age and gender." *Id.* She also claims that when she asked "Chief Barger why she was not on the TAC team anymore," he "replied that it was 'time to pass the torch,' implying that the Plaintiff was too old to do that particular job." *Id.* She argues that she "considers herself to be an accomplished, strong woman, and to hear a demeaning statement like that from one of her superiors was embarrassing and hostile." *Id.* She also claims that at her third meeting with representatives from Human Resources, Deputy Chief Rodriguez told her "'just because things don't go your way, Pat, you use your age,'" and that when she requested to stay with the bus program, Chief Barger told her "that she 'was not getting any younger.'" *Id.* at 14–15.

She argues that, in a workplace where few women were employed, she "was treated differently than her male peers." *Id.* at 15. She claims that Sergeant Riordan directed animosity toward her, including by yelling at her during move-out day of Spring 2015. *Id.* She claims that "[w]hen [she] made a decision regarding staging cars for the move-out process, taking into account her years of experience, and the fact that she had orchestrated smooth operations in the

past, Sergeant Riordan, clearly displeased with [her] showing initiative and keeping things running smoothly, yelled at [her] over the radio, 'I make that call!'" *Id.* She argues that Sergeant Riordan "berated" her "in front of a number of parents, for some unknown reason, which was, needless to say, extremely embarrassing for [her]." *Id.* at 16. She argues that Sergeant Riordan asked other employees how she did after he was absent for two days, and that he singled her out during a roll call. *Id.* She also argues that he ordered her to unzip her jacket in front of him to prove that she was wearing a utility belt. *Id.* Finally, she argues that male employees "who were in the squad room at the time, both did not have visible belts . . . and neither of these officers were spoken to by Sergeant Riordan, let alone pulled into his office and forced to unzip their jackets to prove their uniforms were complete." *Id.* at 16–17. The Court disagrees.

Ms. Hurlie-Smith has not established that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Raspardo*, 770 F.3d at 114. Ms. Hurlie-Smith has not sufficiently linked her complaints about the environment to sex- or age-based discrimination, a necessary element of a hostile work environment claim under Title VII or CFEPA. *See Harris*, 510 U.S. at 21 (explaining that Title VII "makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin'" and that the "phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment") (quoting 42 U.S.C. § 2000e-2(a)(1)).

Ms. Hurlie-Smith has not established that Sergeant Canning,[1] in his daily interactions with her or in his decision to place her in a farther lot, acted based on her gender or her age. For example, Ms. Hurlie-Smith testified that:

> [I]nitially, when [Sergeant Canning] came on, the buses . . . I continued to run every aspect of the program, and he was fine with that, because he was somewhat unfamiliar with how things were run. When he became more familiar, I stepped back. And he obviously didn't care for that. So he stopped talking to me and started isolating me from the other group of people who worked the buses.

*See, e.g.*, Hurlie-Smith Dep. at 33–36. Without more, this testimony does not suggest that Sergeant Canning had a discriminatory motive; instead, the incident reflects the "ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (noting that Title VII is not a "general civility code for the American workplace").

Ms. Hurlie-Smith's cited incidents involving Sergeant Riordan also do not give rise to an inference of discrimination, and, even as neutral acts, do not constitute severe or pervasive harassment. *See Ameti, ex rel. United States v. Sikorsky Aircraft Corp.*, 289 F. Supp. 3d 350, 368 (D. Conn. 2018), *appeal withdrawn sub nom. Ameti v. Sikorsky Aircraft Corp.*, No. 18-653, 2018 WL 2771077 (2d Cir. May 24, 2018) (finding that facially neutral acts of failure to give desired raise, omission of name from a patent, low rating on performance evaluation, and failure to assign the plaintiff a position he was allegedly promised did not constitute severe or pervasive harassment); *cf. Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) (finding that totality of circumstances that included "persistent sexually offensive remarks," explicit graffiti, a sexual

---

[1] As Quinnipiac rightly notes in its reply brief, Ms. Hurlie-Smith's claims that date back to 2014 and earlier, and which were discussed in her EEOC complaint, are barred by the statute of limitations, which requires that she file any federal complaint within 90 days of receiving a right-to-sue letter from the EEOC or CHRO. Reply at 2, ECF No. 32 (citing *Pouncey v. Town of Hamden*, No. 3:14-cv-00475, 2017 WL 5757740, at *5 (D. Conn. Nov. 28, 2017)); *see also* EEOC Release, ECF No. 30-2.

assault by a drunk co-worker, and "the link the men—including supervisors—routinely drew between their perceptions of Petrosino's professional defects and her anatomy, especially their vulgar references to her breasts and menstrual cycle, [] communicated that her gender would always stand as a bar to full acceptance within the workplace").

Indeed, instead of establishing that the totality of the circumstances at her workplace constituted severe or pervasive discrimination, Ms. Hurlie-Smith argues that she viewed her work environment as subjectively and objectively hostile. *See, e.g.*, Opp. to Mot. Summ. J. at 17 ("The fact that the Plaintiff was too physically sick and anxious to report to Sergeant Riordan is clear evidence that subjectively the Plaintiff viewed her work environment as being hostile."). While Ms. Hurlie-Smith may have found her work conditions offensive or even intolerable, however, she has not provided a basis for a reasonable jury to find that the conditions were based in discrimination. Quinnipiac's motion for summary judgment on Count One therefore is granted.

### B. Discrimination Claims

Ms. Hurlie-Smith has asserted a claim of sex discrimination under Title VII (Count Two), sex discrimination under CFEPA, Conn. Gen. Stat. 46a-60 (Count Three), and age discrimination under CFEPA, Conn. Gen. Stat. 46a-60 (Count Four). Because each of those claims is analyzed under the *McDonnell Douglas* burden-shifting framework for employment discrimination claims, and because all three claims involve similar or the same set of facts, the Court will analyze all three in the following section. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) ("We analyze employment-discrimination claims under the ADA, Title VII, and the ADEA using the now-familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."); *see also Sanchez v.*

*Connecticut Nat. Gas Co.*, 421 Fed. App'x 33, 35 (2d Cir. 2011) ("Although *McDonnell Douglas* concerned the burden and allocation of proof under Title VII, its framework is also applied to claims under 42 U.S.C. § 1981 . . . the ADEA . . . and the CFEPA.") (citations omitted).

Title VII prohibits employers from discriminating on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). Employment discrimination claims under Title VII are subject to the three-step burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). To overcome a motion for summary judgment under the *McDonnell Douglas* framework, "[t]he plaintiff . . . must first establish by a preponderance of the evidence, a prima facie case of . . . discrimination." *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (internal quotation marks omitted).

To establish a *prima facie* case of discrimination, the plaintiff must show (1) that she was a member of a protected class; (2) that she was qualified for the position; (3) that she was subject to an adverse employment action; and (4) that the adverse action occurred under circumstances that give rise to an inference of discrimination. *See Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009). The burden of establishing a *prima facie* case is minimal. *See Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) ("The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal.") (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)).

Establishment of a *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee, thus placing upon the defendant "the burden of producing an explanation to rebut the prima facie case—*i.e.*, the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *Hicks*, 509 U.S. at 506–07 (internal quotation marks and citation omitted). "If the defendant makes such a showing,

the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). "[A]lthough the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks and citations omitted).

Finally, although the evidentiary burden shifts back and forth, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Hicks*, 509 U.S. at 518.

Quinnipiac argues that Ms. Hurlie-Smith cannot establish a *prima facie* case of age or sex discrimination because, although she is a member of a protected class and she is qualified for her position, she did not suffer an adverse employment action under circumstances that give rise to an inference of discrimination. Mot. for Summ. J. at 21. Quinnipiac argues that Ms. Hurlie-Smith did not suffer an adverse employment action because she "experienced nothing more than a rejiggering of job responsibilities, with no change whatsoever to her title, seniority, wages, or benefits." *Id.* at 22.

Quinnipiac also argues that the circumstances surrounding Ms. Hurlie-Smith's reassignment do not give rise to an inference of discrimination because "the record is totally devoid of evidence remotely suggesting that discriminatory animus was in play." *Id.* at 24. Quinnipiac argues that "[i]n support of her claim that Chief Rodriguez and Ms. Mathews' decision to remove her from the TAC Team was rooted in age-based animus, plaintiff points to a single comment she attributes to Chief Rodriguez, dating from 2014." *Id.* at 25. Quinnipiac

argues that "there is no nexus whatsoever between the supposed comment from Chief Rodriguez in 2014 and plaintiff's subsequent reassignment from the TAC Team in November 2015," and "the comment does not evidence any animus towards older people; at most, the alleged comment chided plaintiff for being too quick to attribute her workplace grievances to age discrimination." *Id.* at 25–26.

Finally, Quinnipiac argues that Ms. Hurlie-Smith cannot establish that any of its employment decisions were pretextual. *Id.* at 26–27. Quinnipiac argues that "[a]ll [Ms. Hurlie-Smith] offers as support for her discrimination claim is her disagreement with the conclusion reached by Chief Rodriguez and Ms. Mathews that the TAC Team would be best-served by her removal." *Id.* at 27. Even that, Quinnipiac argues, "gets plaintiff nowhere" because it merely shows that Ms. Hurlie-Smith disagrees with Quinnipiac about her performance, and not that Quinnipiac was motivated by discriminatory intent. *Id.* Quinnipiac argues that instead, her "challenged reassignment decision was occasioned by the operational problems and dysfunction on the TAC Team uncovered by Ms. Mathews' objective investigation," and not on discriminatory intent. *Id.* at 27–28.

Ms. Hurlie-Smith responds that she "suffered an adverse employment action" because she "loved the position she previously held because she would interact with a whole host of individuals, from faculty to students, when she would perform her duties on the bus service provided to the students," a job that, she argues, put her skills and interests to work. Opp. to Mot. for Summ. J. at 25–26. She argues that she "was taken off of this detail that she loved so much, and placed in a gate and given different hours," that she lost the "prestige that came along with" the responsibilities of that position, and although "it is not necessary that the Plaintiff suffer pecuniary loss, [] this is also what has happened, indirectly." *Id.* at 26.

Ms. Hurlie-Smith also argues that the circumstances of her employment at Quinnipiac give rise to an inference of discrimination because she was "treated differently than her younger, male colleagues," including by being "banished to the other side of campus with nothing to do on a day (moving day) when her skills would have been extremely beneficial." *Id.* at 28. She also argues that Chief Barger told her that it was time to pass the torch, and that she was not getting any younger. *Id.* She also argues that when Sergeant Riordan asked her to remove her windbreaker, "two younger, male officers in the squad room at the time" were not asked to do the same, even though one "did not have his utility belt on and the other's was not plainly visible." *Id.* at 29. She argues that Sergeant Riordan's "power play . . . can only have been meant to demean the Plaintiff because she was a woman." *Id.* The Court disagrees.

Ms. Hurlie-Smith has not established a *prima facie* case of discrimination based on her age or sex. Although Ms. Hurlie-Smith is a member of a protected class and was qualified for her position, she has not established that she suffered an adverse employment action. "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). U.S. 75, 81 (1998)); *see also Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (noting that while *Burlington Northern* announced a new standard for materially adverse employment actions, "[s]till, actions that are 'trivial harms'—*i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience'— are not materially adverse.") (*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011)).

A reasonable juror could not find that Ms. Hurlie-Smith's transfer to a different full-time position at Quinnipiac with the same pay is an adverse employment action, evaluating her circumstances under an objective standard. *See Rivera*, 743 F.3d at 24 ("material adversity is to be determined objectively, based on the reactions of a reasonable employee"); *see id.* (noting that "reassignment of job duties is not automatically actionable" but finding that "the jury had before it considerable evidence that the [new] duties were by all accounts more arduous and dirtier; that the [previous] position required more qualifications, which is an indication of prestige; and that the [previous] position was objectively considered a better job and the male employees resented White for occupying it") (internal quotation marks and citation omitted); *see also Dziedzic v. State Univ. of New York at Oswego*, 648 Fed. App'x 125, 128 (2d Cir. 2016) (finding reassignment "not materially adverse" where the plaintiff had been placed in that position previously, she held the same title, and the record lacked evidence that the new department was less prestigious), *cert denied*, 137 S. Ct. 1100 (2017), *reh'g denied*, 137 S. Ct. 1618 (2017).

Indeed, there is no evidence in this record that Ms. Hurlie-Smith's reassignment of duties in the same job at Quinnipiac made her worse off. While Ms. Hulie-Smith's counsel argued at oral argument that the transfer prevented her from working overtime because she no longer had the will to work longer hours, Quinnipiac clarified and Ms. Hurlie-Smith's counsel agreed, that overtime was still available to Ms. Hurlie-Smith, as it had been before. The Court thus finds that Ms. Hurlie-Smith has not shown that her reassignment was materially adverse.

The Court therefore finds that Ms. Hurlie-Smith has not established a *prima facie* case, despite the minimal burden required to establish one. *See Walsh*, 828 F.3d at 75 ("The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal.")

(quoting *Norton*, 145 F.3d at 118). As a result, summary judgment will be granted on all of her discrimination claims.

Even if Ms. Hurlie-Smith could establish a *prima facie* case—although, as discussed above, this record lacks any such evidence—the Court also finds that this case otherwise falls short of warranting a jury trial. First, Quinnipiac has "the burden of producing an explanation to rebut the prima facie case—*i.e.*, the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *Hicks*, 509 U.S. at 506–07 (internal quotation marks and citation omitted). Second, this burden has been satisfied.

Here, Ms. Hurlie-Smith's reassignment resulted from a human resources-led investigation into unrest in the TAC Team. This investigation revealed that Ms. Hurlie-Smith "changes or deviates from orders," and it concluded that "[i]n the course of the investigation of Bob Riordan's treatment of [Ms. Hurlie-Smith], it became clear that how [Ms. Hurlie-Smith] deals with TAC duties and staff has created huge conflict in the unit," and that her teammates were "clearly frustrated and annoyed at [her]." *Id.* at 85. Quinnipiac therefore decided to "remove [Ms. Hurlie-Smith] from the TAC unit and have her work on the midnight crew (her normal shift when not working TAC)." *Id.* In other words, Quinnipiac allegedly reassigned Ms. Hurlie-Smith in order to have the institution work more effectively.

Second, with that legitimate non-discriminatory reason, the burden shifts back to Ms. Hurlie-Smith to prove discrimination, for example, by showing that the employer's proffered reason is pretextual. *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). This proof of pretext may be "the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . ." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks and citations omitted). In any event, "[t]he ultimate burden of

persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Hicks*, 509 U.S. at 518.

But on this record, no reasonable juror could conclude that Ms. Hurlie-Smith was discriminated against on the basis of either her age or her sex. First, any allegations related to Ms. Hurlie-Smith's 2014 EEOC complaint are barred by the statute of limitations because she did not file a civil complaint in federal court within 90 days of the release of jurisdiction. *Pouncey v. Town of Hamden*, No. 3:14-cv-00475, 2017 WL 5757740, at *5 (D. Conn. Nov. 28, 2017).

The remaining allegations of discrimination therefore relate to Sergeant Riordan's request that Ms. Hurlie-Smith remove her windbreaker, and his brusque comments to her while he was supervising her, including when she was involved in staging cars, when she was monitoring an area away from the buses, and when she stood on the stair leading up to the bus to prevent students from attempting to board it. None of these allegations, however, relate to Ms. Hurlie-Smith's age and the claim of age discrimination therefore cannot be sustained and must be dismissed as a matter of law.

Ms. Hurlie-Smith also has failed to offer evidence establishing a causal link between her reassignment, the only adverse employment action identified, with Sergeant Riordan's actions, even if his actions were based on her gender. As discussed above, the undisputed record evidence is that her reassignment resulted from a broader human resources review, not any decision undertaken by Sergeant Riordan. Even if that were not the case, there is nothing in the record to suggest that the disagreements between Sergeant Riordan and Ms. Hurlie-Smith about how to stage cars related to anything but differences in approach. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) ("Our role is to prevent unlawful hiring

practices, not to act as a 'super personnel department' that second guesses employers' business judgments.") (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir.), *cert denied*, 528 U.S. 815 (1999)). Certainly, Ms. Hurlie-Smith has not put forth the evidence necessary to link this to her gender. *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) ("An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.") (quoting *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (internal quotation marks omitted)). The Court therefore finds that, even assuming that Ms. Hurlie-Smith's removal from the TAC Team was an adverse employment action, no reasonable juror could find that the decision was made under circumstances giving rise to an inference of discrimination on the basis of her age or sex. Summary judgment therefore is warranted on her claims of discrimination under Title VII and CFEPA for age and sex.[2]

---

[2] At oral argument, plaintiff's counsel argued that these issues should be decided at trial because of the "vanishing trial," suggesting that summary judgment motions are prematurely granted and foreclose an opportunity for a plaintiff to present her case to a jury. *See, e.g.*, Marc Galanter, *The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts*, 1 J. Empirical Legal Stud. 459, 460 (2004) (noting that the number of trials "[o]ver the past generation or more . . . has undergone a sharp decline"). While there may be fewer trials in federal court for a variety of reasons, summary judgment is appropriate where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment thus prevents a moving party from having to defend against a claim at trial for which there is, "under the governing law, . . . but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250; *see also* Martin H. Redish, *Summary Judgment and the Vanishing Trial: Implications of the Litigation Matrix*, 57 Stan. L. Rev. 1329, 1358 (2005) ("While empirical inquiry has focused on the 'vanishing' trial, summary judgment focuses on ferreting out the 'unnecessary' trial. The two are, of course, not necessarily the same. Our goal in shaping summary judgment doctrine must be to separate the necessary from the unnecessary trial.").

## IV.     CONCLUSION

For the foregoing reasons, Quinnipiac's motion for summary judgment is **GRANTED**.

The Clerk of the Court is directed to close this case.

**SO ORDERED** this 7th day of September, 2018, at Bridgeport, Connecticut.

/s/ Victor A. Bolden
Victor A. Bolden
United States District Judge
